# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANDREA KORETZ, | : | Civil No. 1:20-CV-02368 |
| Plaintiff, | : | |
| v. | : | |
| DIRECT BUILDING SUPPLIES, LLC d/b/a RENU SOLAR, | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## **MEMORANDUM**

Before the court is a motion for summary judgment filed by Defendant Direct Building Supplies, LLC, d/b/a Renu Solar ("Renu"). (Doc. 31.) Because the court finds that there are disputed material facts, the court will deny Renu's motion for summary judgment.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff Andrea Koretz was hired by Renu through Shannon Holtzinger ("Holtzinger"), Renu's regional sales manager, on June 12, 2019, as a solar sales representative/consultant. (Doc. 32, ¶¶ 1–2.) When she was hired, Koretz advised Holtzinger that she previously had a stroke, which left her with certain cognitive disabilities, requiring accommodations to perform her job duties. (*Id.* ¶ 3; Doc. 34-

---

[1] In considering Renu's motion for summary judgment, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to Plaintiff as the nonmoving party in accordance with the relevant standard for deciding a motion for summary judgment. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

1

2, ¶ 3.)  Holtzinger was Koretz's direct supervisor, however, Koretz was also managed by Holtzinger's supervisors, COO Marc Misiti and CEO/President Adam Thau.  (Doc. 32, ¶ 4.)  Koretz's job duties included: receiving a list of appointments, preparing for and attending those appointments, explaining solar power, reviewing the potential customer's electric bill, overcoming any objections from the potential customer, custom-building a proposal for a particular customer's needs, presenting, selling, and completing paperwork.  (*Id.* ¶ 5.)

According to Holtzinger, all new sales consultants are provided with a two-week training period that is scheduled for Monday through Friday.  (Doc. 32-1, p. 38.)[2]  As an accommodation for her disability, Koretz requested additional training time when she was hired, and Holtzinger offered Koretz with four weeks of paid training.  (Doc. 32, ¶¶ 7–8.)  That additional training time was provided to Koretz.  (Doc. 32-1, pp. 38–39; Doc. 32-2, pp. 96–97.)  Besides additional training time, Koretz requested two consecutive days off, specifically, Sundays and Mondays.  (Doc. 32, ¶ 11.)  Renu agreed to accommodate Koretz's requested schedule of working Tuesdays through Saturdays after training was complete.  (Doc. 32-1, p. 38–39.)  Koretz acknowledges that Renu agreed to provide additional training as she requested and that she received more training than the

---

[2] For ease of reference, the court uses the page numbers from the CM/ECF header.

typical employee.[3] (Doc. 32-2, pp. 66, 87.) When Koretz requested additional training time, Holtzinger testified that she arranged for that training by placing Koretz back on a training schedule of Monday through Friday. (Doc. 32-1, pp. 38–39.) However, there is some confusion about when the training schedule ended, and the requested Tuesday through Saturday schedule began. (*See* Doc. 32-2, p. 72.)

On July 19, 2019, Koretz emailed Holtzinger requesting additional modifications, some of which related to her disability. (Doc. 32, ¶ 17.) Renu treated this July 19th email as a request for accommodation under the Americans with Disabilities Act and consulted with Elaine Davis ("Davis"), Renu's human resources consultant, on how to addresses the variety of requests made by Koretz. (*Id.* ¶ 18.) Koretz was then asked to attend a meeting with Holtzinger, Misiti, and Davis on July 23, 2019, which she attended. (*Id.* ¶ 19.) They discussed the accommodations that Renu already provided to Koretz and opened the discussion to any additional accommodations that would help Koretz perform her job duties. (Doc. 32-4, ¶ 16; Doc. 32-2, p. 78.) However, during the call with Davis to schedule the July 23 meeting and throughout the meeting on July 23, Koretz acted

---

[3] Koretz complains that she never received a training schedule and felt that the training was unorganized because the information was conveyed in a "piecemeal" fashion making it more challenging for her to absorb. (Doc. 32-2, pp. 87, 89–90.)

in a defensive, disrespectful, and insubordinate manner.[4]  (Doc. 32-4, ¶¶ 10, 13, 14, 15; Doc. 32-1, p. 36.)  Holtzinger recalls that at one point during the meeting, Koretz stood up, "picked up the folding chair she was sitting on, slammed it on the ground, spun it around, [and] sat down with her back towards us."  (Doc. 32-1, p. 36.)  During the meeting, Koretz was verbally warned that disrespectful, and insubordinate behavior was not acceptable and not productive for resolving her accommodation requests.  (Doc. 32-4, ¶ 13.)  Davis documented Koretz's behavior and verbal warning for insubordinate behavior in her "Record of Continuing Events."  (Doc. 32-4, ¶ 15; Doc. 32-5.)

Additionally, Koretz, Holtzinger, Misiti, and Davis discussed Koretz's accommodation requests during the meeting.  (Doc. 32-4, ¶ 16.)  In the days following the meeting, Davis prepared a "Resolutions/Clarifications" memorandum addressing each point raised in Koretz's July 19, 2019 email to Holtzinger as discussed during the July 23, 2019 meeting.  (Doc. 32-4, ¶ 17; Doc. 32-6.)  Some of Koretz's July 19 accommodation requests could not be granted, such as starting a new "community relations division," because it would require Renu to create a new position putting an undue hardship on Renu.  (Doc. 32-4, ¶ 18; Doc. 32-6, p. 1.)  However, Renu agreed to other modifications to the

---

[4] Koretz disputes that she was defensive, disrespectful, or insubordinate, stating that she was nervous and "trying to understand everything going on."  (Doc. 32-2, pp. 99–100.)

training program at Koretz's request, such as eliminating the shadowing component, which Koretz felt would be ineffective for her. (Doc. 32, ¶ 29.) Further, after requesting additional training on calculating rates for potential customers in her email and during the meeting, Renu determined that Holtzinger would provide additional training in this regard. (Doc. 32-4, ¶ 20; Doc. 32-6, pp. 1–2.) The record is unclear whether this determination and other accommodation decisions were made during the meeting or afterwards. (*See* Doc. 32-7.)

Koretz's recollection of the discussion during the July 23, 2019 meeting differs from Davis's "Resolutions/Clarifications" memorandum. Koretz believes additional training was discussed, but no one specifically stated that she would receive additional training or what the parameters of that training would be. (Doc. 32-2, pp. 99–104.) Further, Koretz generally disagrees with the "Resolutions/Clarifications" memorandum prepared by Davis. (*Id.* at 77.)

On Saturday, July 27, 2019, Holtzinger notified Koretz via email that her one-on-one training on rate calculations and financing options would be held on Monday, July 29, 2019. (Doc. 32, ¶ 31.) The same day, Koretz responded by asking that the training commence on Tuesday because Monday was one of her days off and she had personal appointments scheduled for Monday. (Doc. 32-7.) On a prior date, Koretz had attended training on a Monday. (Doc. 32, ¶ 33.) On Sunday, July 28, 2019, Holtzinger replied to advise Koretz that the training could

not be moved from July 29th because she had rearranged her schedule to accommodate the additional training session for Koretz, but she could bring a job coach as requested. (Doc. 32, ¶ 38; Doc. 32-7.) Holtzinger also explained that Koretz would hear from Davis on July 29 or 30 on the remaining requested accommodations. (*Id.*) Koretz did not respond to Holtzinger's July 28 email. (Doc. 32, ¶ 35.)

Koretz did not attend the scheduled training on July 29, 2019, nor did she contact anyone at Renu on July 29 to advise that she would not attend the training. (*Id.* ¶ 36; Doc. 32-4, ¶ 37.) However, Koretz submits that her July 27, 2019 email provided notice that she would not be attending the training on July 29, 2019. (Doc. 34-2, ¶ 37; Doc. 32-7.) After Koretz's "no call/no show" as classified by Renu, Davis, Holtzinger, and Misiti met to determine an appropriate disciplinary action. (Doc. 32-1, pp. 36–37; Doc. 32-4, ¶ 28.) Holtzinger and Misiti indicated that Koretz's failure to attend training on July 29 without notice was a continuation of her insubordinate conduct and that this conduct in conjunction with her failure to appear without notice was unacceptable. (Doc. 32-1, pp. 36–37; Doc. 32-4, ¶ 28.) Davis, Holtzinger, and Misiti determined that termination of Koretz's

employment was appropriate for these reasons.[5]  (Doc. 32-1, pp. 36–37; Doc. 32-4, ¶ 28.)

This case was initiated on December 17, 2020, by Koretz filing a two-count complaint setting forth claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Con. Stat. Ann. § 951, *et seq.*, for failure to accommodate and wrongful termination.  (Doc. 1.)  In accordance with the operative case management order, Renu filed the instant motion for summary judgment, statement of facts, and brief in support on November 30, 2022.  (Docs. 31, 32, 33.)  Koretz timely filed a brief in opposition on December 20, 2022, and Renu filed a reply brief on January 3, 2023.  (Docs. 34, 35.)  Thus, this motion is ripe for resolution.

## JURISDICTION

This court has federal question jurisdiction in this case as the complaint asserts claims arising under federal law.  *See* 28 U.S.C. §§ 1331, 1343.  Additionally, the court has supplemental jurisdiction over Koretz's state law claims pursuant to 28 U.S.C. § 1367.  Further, venue is appropriate in the Middle District of Pennsylvania because Renu conducts business in this District and a substantial

---

[5] Neither party states that Koretz's employment was actually terminated on July 29, 2019, but the court accepts this fact for purposes of resolving this motion as it was alleged in the complaint. (*See* Doc. 1, ¶ 42.)

7

part of the facts giving rise to the claims raised occurred within this District. *See* 28 U.S.C. § 1391.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (citation omitted).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**DISCUSSION**

In its motion for summary judgment, Renu argues that it should be granted judgment in its favor on Koretz's failure to accommodate claims under the ADA and PHRA because Koretz was terminated for insubordinate behavior and a "no call/no show" for the additional training she was provided. (Doc. 33, pp. 10–14.) Renu also submits that judgment should be entered in its favor on Koretz's wrongful termination claim because Renu can establish legitimate, non-discriminatory reasons for terminated Koretz's employment. (*Id.* at 14–18.) The court will address each of these claims in turn.[6]

### A. The court will deny summary judgment on Koretz's failure to accommodate claims under the ADA and PHRA.

In relevant part, the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of disability discrimination, the employee must establish that:

> "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he

---

[6] When there is no dispute regarding whether a plaintiff is disabled, ADA and PHRA claims are analyzed together as the claims are essentially the same and Pennsylvania courts interpret the PHRA in accord with its federal counterpart, the ADA. *See Pulchalski v. Franklin Cnty.*, No. 15-cv-1365, 2018 WL 2225359, at *9 n.3 (M.D. Pa. Feb. 14, 2018) (quoting *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002)). Thus, because the parties do not dispute whether Koretz is disabled, the court addresses the ADA and PHRA claims together.

has suffered an otherwise adverse employment decision as a result of discrimination" . . . which in this context includes refusing to make reasonable accommodations for a plaintiff's disabilities.

*Hohider v. UPS, Inc.*, 574 F.3d 169, 186–87 (3d Cir. 2009) (citations omitted). Following a qualified individual's request for an accommodation, the employer "must make a reasonable effort to determine the appropriate accommodation," which is "best determined through a flexible, interactive process." *Id.* (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 311 (3d Cir. 1999)).

The interactive process requires that the employer make a good-faith effort to determine accommodations for the employee. *Taylor*, 184 F.3d at 317. An employer fails to engage in the interactive process when: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Id.* at 319–20 (citations omitted). Employers can demonstrate their good faith in many ways, such as meeting with an employee after a request for accommodation has been made, requesting information from the employee about their disability and limitations, ask what the employee specifically wants as an accommodation, demonstrate to the employee that the employer considered the request, and offer

11

and discuss alternative accommodations if the ones requested are too burdensome for the employer. *Id.* at 317.

Here, Renu does not contest that Koretz is a disabled person as defined by the ADA, that she requested accommodations to perform her job duties, and that the parties began engaging in the interactive process to determine appropriate accommodations. (Doc. 33, p. 11.) Rather, Renu asserts that the interactive process ended when Koretz's employment was terminated for insubordinate behavior and a "no call/no show" for additional training as part of a reasonable accommodation. (*Id.*) Renu further argues that Koretz cannot identify any reasonable accommodation requests that were not provided to her. (Doc. 33, p. 13.) She was provided additional training time and two consecutive days off, Sundays and Mondays, which Renu submits began once training was complete. (*Id.*) Renu also met with Koretz to review the additional requested accommodations from her July 19, 2019 email and states that it provided many of the requested accommodations that were not unreasonable and burdensome to Renu. (*Id.* at 13–14.) Ultimately, Renu submits that it was Koretz's actions, not Renu's, that were responsible for the breakdown in the interactive process. (*Id.* at 14.)

Koretz seems to conflate her wrongful termination and failure to accommodate claims in that she argues that she was terminated for "illegitimate

pre-text." (Doc. 34, p. 9.) Nonetheless, Koretz submits that her July 27 email provided notice that she would not be able to attend the July 29 training as it was her scheduled day off, which was one of her two consecutive days off in accordance with her disability accommodation. (*Id.* at 9–10.) Koretz ultimately argues that there are disputed facts regarding the training and the requested accommodations that preclude entry of summary judgment in Renu's favor. (*Id.*)

Viewing the evidence in a light most favorable to Koretz, the record is murky at best as to when the Monday through Friday training schedule ended and the Tuesday through Saturday schedule began. That said, the court finds that the record reasonably demonstrates that the July 29 training was scheduled on a day that Koretz was scheduled to be off, in contradiction to the accommodation that Renu had previously granted. Furthermore, the July 27 and 28 email exchange between Koretz and Holtzinger indicate that the July 29 training was scheduled with just two days notice, and that Renu was still working with Koretz regarding her other accommodation requests. While the court agrees with Renu that it began engaging in the interactive process, a reasonable jury could find that Renu abandoned its good faith effort when it terminated Koretz for failing to attend training on short notice, on her day off, with the other accommodation requests still outstanding. For these reasons, the court will deny Renu's motion for summary judgment as to Koretz's failure to accommodate claims.

## B. The court will deny summary judgment on Koretz's wrongful termination claim under the ADA and PHRA.

To establish a prima facie case of disparate treatment under the ADA, a plaintiff must show that "[s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (quoting *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)). The *McDonnell Douglas* burden-shifting framework applies to ADA disparate treatment claims. Thus, once the plaintiff establishes a prima facie case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)). If the defendant is able to articulate a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Jones*, 198 F.3d at 410).

For the purpose of this motion, Renu concedes that Koretz can establish a prima facie case and that there is a close temporal proximity between Koretz's disclosure of her disability and her employment termination. (Doc. 33, p. 17 &

14

n.2.) However, Renu asserts that the evidence clearly establishes that it had a legitimate, non-discriminatory reason for terminating Koretz's employment—specifically, Koretz interacted with management in a disrespectful and insubordinate manner quickly followed by a "no call/no show" for additional training. (*Id.*) Renu submits that courts within the Third Circuit routinely find that employers do not need to excuse employee misconduct or a failure to show up for work. (*Id.* at 17–18.) Conversely, Koretz submits that Renu's reasons for terminating her employment are pretextual as she was still engaging in training and the alleged "no call/no show" was scheduled on her day off. (Doc. 34, pp. 11–14.)

Again, viewing the evidence in a light most favorable to Koretz, the court finds that granting summary judgment on the present record is not warranted. Even accepting Renu's reasons for terminating Koretz's employment as legitimate and nondiscriminatory, a reasonable jury could find Renu's reasons to be pretextual. As detailed previously, the record presented at this stage reasonably demonstrates that the July 29 training was scheduled on a day that Koretz was scheduled to be off, in contradiction to the accommodation Renu granted. Additionally, the July 27 and 28 email exchange between Koretz and Holtzinger indicate that the July 29 training was scheduled with just two days notice and that Renu was still working with Koretz regarding her other accommodation requests. While insubordination and a failure to report to work can be legitimate

nondiscriminatory reasons for termination of employment, the disputed facts in this case do not allow for a conclusion that the proffered reasons were not pretextual. Thus, the court will deny Renu's motion for summary judgment as to Koretz's wrongful termination claims.

## CONCLUSION

For the reasons stated herein, the court will deny Renu's motion for summary judgment. An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: December 27, 2023